Filed 3/17/21  P. v. Perez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072117 |
| v. | (Super.Ct.No. FSB1500074) |
| MICHAEL ANGELO PEREZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  William Jefferson Powell, IV, Judge.  Affirmed as modified with directions.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant Michael Angelo Perez.

Patricia M. Ihara, under appointment by the Court of Appeal, for Defendant and Appellant, Deserae Lenore James.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Michael Angelo Perez and Deserae Lenore James were tried and convicted of torturing and murdering Christine Jo Kunstmann. In a joint trial, James and Perez were found guilty of first degree murder (Pen. Code,[1] § 187, subd. (a), count 1) with a torture-murder special circumstance (§ 190.2, subd. (a)(18)), as well as a separate count of torture (§ 206, count 2). Both were sentenced to life without parole for count 1, plus a consecutive life term for count 2.

In this appeal, Perez and James both contend that (1) there was no substantial evidence of premeditation or deliberation to support their first degree murder convictions; (2) their punishment for count 2 must be stayed pursuant to section 654 because that count has the same factual basis as the torture-murder special circumstance; and (3) a parole revocation fine imposed pursuant to section 1202.45 should be stricken since their sentences do not include the possibility of parole. Perez argues separately that (1) the trial court abused its discretion by denying his motion for a mistrial based on ineffective assistance of counsel, and (2) his sentence and presentence credits are described incorrectly in his abstract of judgment. James argues separately that (1) the jury instruction on aiding and abetting was prejudicially ambiguous; (2) her trial counsel provided ineffective assistance of counsel by failing to object to the prosecutor's misstatement of the elements of the special circumstance allegation and a related defect in the verdict form; (3) her trial counsel provided ineffective assistance of counsel by

_____

[1] Further undesignated statutory references are to the Penal Code.

2

failing to object to the prosecutor's incorrect definition of "intent to kill"; and (4) the cumulative error doctrine applies.

The People concede, and we agree, that the punishments imposed for count 2 should have been stayed pursuant to section 654, that the parole revocation fines should be stricken, and that the errors in Perez's abstract of judgment should be corrected. In all other respects, we affirm the judgments.

## I. BACKGROUND

Since childhood, Kunstmann suffered from petit mal seizures that would temporarily cause her to slur her words and become somewhat incoherent. As an adult, she could often anticipate the seizures coming on, which they would about twice a month; she would take medication and return to normal within 10 or 15 minutes. Her father testified that she did not have a mental impairment, though she did take special education courses in school. Friends, however, described her as mentally slow, and naïve or gullible in at least some respects. She received social security disability payments, but also worked some and received financial support from her father. She had her own apartment, credit cards, and a car.

Perez and Kunstmann knew one another for years before her death in 2011. Their relationship was not a healthy one. Kunstmann was in love with Perez. Perez was aware of what he called her "fatal attraction," and returned her feelings with emotional and physical abuse. Perez described Kunstmann to police as the "perfect wife"; she supported him financially, providing him and his girlfriends with cellphones, clothes,

food, cigarettes, jewelry, and anything else he wanted, as well transportation using her car.  Perez regularly yelled at Kunstmann, calling her names and threatening to end their friendship, including when she could not accommodate his financial demands.  Friends of Kunstmann observed bruises on her, as well as physically violent behavior by Perez.  On several occasions, in the presence of others, Perez threatened Kunstmann that he would kill her.

Perez, James, and a third person, Virginia Backlund, were romantically involved with one another, and James and Backlund each have children with Perez.  During the relevant time period, Backlund and Perez lived together.  James had her own apartment, but spent a substantial amount of time at Perez's, sometimes caring for Backlund's baby son, who was about the same age as her own.[2]  Deesha Sterling and Tabitha Duncan, who were a couple and were also friends of Perez, sometimes stayed at James's apartment (the record is ambiguous as to whether they resided there, or if they were just regular, extended visitors).  Sterling often cared for James' child for extended periods of time.

---

[2] The record and the parties' briefing are unclear as to exactly how many children Perez, James and Backlund had, or when and with whom they had them.  At trial, James stated that the two children she had with Perez were not born until after Kunstmann's death.  She had a child, born in July 2010, with a previous boyfriend.  On this basis, we infer that the child discussed here, described as about the same age as Backlund's baby, was not Perez's biological child.

4

It is difficult to determine with precision when the events, including torture, that led to Kunstmann's death occurred. We infer that these events occurred in the weeks immediately before Kunstmann's partially decomposed body was found by police on July 15, 2011. There was evidence that Perez and James purchased cleaning supplies used in disposing of Kunstmann's body and other evidence on June 2 and 3, 2011. Kunstmann was still alive a couple of days before Memorial Day 2011 (May 30), which was the last time she spoke to her father by telephone.

On an occasion, probably in May 2011, Sterling called Perez, who did not own a car, to ask for a ride home from work. Perez sent Kunstmann. Kunstmann drove in a manner that Sterling found reckless. Sterling testified that when she confronted Kunstmann about her driving, Kunstmann suggested that she was acting out of jealousy over Perez. Sterling complained to Duncan and Perez that Kunstmann had tried to kill her. On a different occasion or occasions, Kunstmann drove recklessly with the children of Perez, James, and Backlund in the car. Perez was angered and believed Kunstmann was intentionally trying to hurt his family. James, too, believed that Kunstmann was jealous of Perez's relationships with her and Backlund, though she told police she believed Kunstmann's dangerous driving was more careless or a product of "poor decisionmaking" than true intent to hurt anyone.

A few days after the incident of reckless driving involving Sterling, Perez arranged for all of them—Perez, Backlund, James, Sterling, and Duncan—to drive out to a secluded spot with Kunstmann for a confrontation, to punish her for endangering the

5

children and to scare her into stopping such behavior. Sterling believed that the plan was for her to fight Kunstmann. Kunstmann was instead subjected to a group beating, with all the others joining in slapping, hitting, and kicking her. Afterwards, Kunstmann was "black and blue," and in pain to the point that she had trouble walking, but she nevertheless drove Perez, Backlund, and James back to Perez and Backlund's apartment. Backlund and James went inside first; Perez and Kunstmann stayed in the car, and he burned her on the stomach with a cigarette before helping her walk inside.

Some time after the group beating, Kunstmann was seen by a neighbor outside Perez's apartment; she was visibly bruised "pretty much from head down," but she said that she was okay. Another neighbor observed large bruises on Kunstmann's forearms. Kunstmann told several friends that she had hit herself on a door. Sterling saw Kunstmann at the pediatrician's office; Kunstmann had driven Backlund, James, and their babies there for an appointment. Sterling observed that Kunstmann was scratched and was wearing gloves. When asked, Kunstmann said that she had burned her hands after having a seizure, and that Perez had "saved her." Sterling testified that she apologized to Kunstmann for her part in the beating, and Kunstmann accepted the apology.

After the group beating, however, the violence towards Kunstmann escalated further.[3] At Perez and Backlund's apartment, over the course of several days, Perez,

_____

[3] Some of Perez's and James's statements to police, taken in isolation, can be understood to suggest that the torture of Kunstmann began more or less immediately after the group beating. At other points, however, Perez and James both estimated that it was

6

James, and Backlund subjected Kunstmann to abuse that Perez later characterized as "vicious," and that James analogized to the torture her grandfather described suffering as a prisoner of war. At one point, Perez slammed Kunstmann's head against something—either a door, a sink, or both—hard enough to leave a knot. Perez told police he did so after Kunstmann threatened to kill two of the family's children. Perez later pushed Kunstmann's face into a toilet, then urinated on her while Backlund berated her verbally. Kunstmann was moved to a bathtub, where Perez did "water treatments," that is, putting a washcloth over Kunstmann's face and pouring water over the washcloth to simulate drowning. James denied holding down Kunstmann during the waterboarding treatments, as Perez told police she did, but she admitted that she was there, urging Kunstmann to "tell the truth" about whether she in fact intended to harm the children. James and/or Backlund held Kunstmann while Perez burned her breasts with a hair styling tool. (At trial, James testified that she had been trying to help Kunstmann up from the floor, not hold her down, when Perez unexpectedly burned Kunstmann.) Three times, as Kunstmann lay naked in the bathtub, Perez poured a flammable liquid—apparently rubbing alcohol or lighter fluid—into the water and set it on fire, burning Kunstmann.

about two weeks between the group beating and the torture. Other evidence, discussed above, also tends to suggest there was a gap of a week or two between the group beating and the torture.

Perez also scalded Kunstmann with water so hot that it caused the skin of her feet to slough off. While Kunstmann was undergoing this abuse, she had frequent seizures.

At some point, Duncan came by Perez and Backlund's apartment, and saw Kunstmann lying naked in the bathtub, moaning in pain, with blistering burns on her legs, breasts, and stomach. Duncan told Perez, James, and Backlund that they needed to call an ambulance. Perez responded that he was "treating her my way." James testified that she tried to get Kunstmann "back to normal" by helping her eat and drink, putting ointment and bandages on her burns, bathing her, and giving her seizure medication. James further testified that she too urged Perez and Backlund to "call 911," but Perez told her no, because then "they would find out what happened and all our kids would get taken away."

Kunstmann died after about three days. James and Perez buried Kunstmann in the secluded area where the group beating had happened. An autopsy was unable to determine a specific cause of death because the body decomposed for some time before discovery. Based on hypothetical circumstances similar to those described above, however, the forensic pathologist opined that a likely cause of death was "the accumulation of the attacks on the body."

In 2011, police interviewed Perez and James. They denied knowing anything about Kunstmann's death. In 2015, however, Backlund, who no longer lived with Perez, wrote a letter to police implicating Perez and James. When reinterviewed in 2015, Perez and James gave detailed statements to police—first in separate interviews, then in a joint

8

interview—admitting that they had been involved in the beating, waterboarding, and burning of Kunstmann that led to her death. They denied that they had intended for Kunstmann to die, stating that they were just trying to "get the truth out of her" as to whether she intended any of the family harm. Perez also admitted that he inflicted pain on Kunstmann to get "revenge."

In the 2015 interviews, James and Perez agreed that the decision to "get the truth out of [Kunstmann] one way or another" was a collective decision by Perez, James, and Backlund. At trial, James told a different story, minimizing her responsibility for Kunstmann's death as a failure to stop Perez: "I didn't do anything. I didn't help. I didn't stop him. If I had, she would be alive." She denied taking any part in the physical acts of torture Perez inflicted on Kunstmann. She testified that she failed to act to stop the torture or later to inform police what had happened because she was afraid of Perez: "I seen what he did to [Kunstmann]. He beat me, he raped me, he threatened the love of my life and my child." James also testified that Backlund had threatened that Perez and Backlund would blame everything on her if she did not say and do what Perez told her to say and do.

The jury found both Perez and James guilty of first degree murder (§ 187, subd. (a), count 1) with a torture-murder special circumstance (§ 190.2, subd. (a)(18)), as well as a separate count of torture (§ 206, count 2). The trial court sentenced both to life without parole for count 1, plus a consecutive life term for count 2.

## II.  DISCUSSION

A.  *Substantial Evidence of Premeditation and Deliberation*

Perez and James contend that there is insufficient evidence to support the jury's conclusion that Kunstmann's killing was premeditated and deliberate, requiring reversal of their first degree murder convictions and the torture-murder special circumstance findings.  We disagree.

In the context of first degree murder, "'premeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"  (*People v. Mayfield* (1997) 14 Cal.4th 668, 767, overruled on other grounds as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn.2.)  "'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ."'"  (*People v. Lee* (2011) 51 Cal.4th 620, 636.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), our Supreme Court "identified three categories of evidence relevant to determining premeditation and deliberation: (1) events before the murder that indicate planning; (2) a motive to kill; and (3) a manner of killing that reflects a preconceived design to kill."  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663 [discussing *Anderson*].)  These factors "are not all required [citation], nor are they exclusive in describing the evidence that will support a finding of

premeditation and deliberation." (*Ibid.*) "It also is not necessary that any of these categories of evidence be accorded a particular weight [citation], and it is not essential that there be evidence of each category to sustain a conviction." (*People v. Gonzalez* (2012) 210 Cal.App.4th 875, 887.) Rather, these factors are intended "to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*Ibid.*) "In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*Ibid.*) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

11

Applying the factors of *Anderson*, *supra*, 70 Cal.2d at pp. 26-27, and reviewing the evidence in the light most favorable to the judgment, sufficient evidence supports the conclusion that both Perez and James acted with premeditation and deliberation. As to Perez, the issue is not close. He had previously threatened to kill Kunstmann and had repeatedly been physically violent towards her. (See *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, 1613 [evidence of "discord" in relationship and prior assaults "had a tendency in reason to show appellant's intent to beat, torture, and ultimately murder" the victim].) Moreover, Perez told police that he had caused Kunstmann to hit her head after she first endangered and later threatened James's and Backlund's children, and attributed the torture that followed to "revenge," as well as an attempt to learn the "truth" about whether she meant it. At least some of Perez's previous threats to harm Kunstmann had also related to perceived interference with his relationships with a different girlfriend's children. From such evidence, the jury reasonably could infer both planning and motive. The manner of Kunstmann's killing—an escalating series of violent acts over an extended period of time—also supports an inference of premeditation and deliberation, rather than "mere unconsidered or rash impulse." (*People v. Perez*, *supra*, 2 Cal.4th at p. 1125; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201-202 [evidence of "continuing and escalating acts of abuse" supported finding of premeditation and deliberation].) Thus, there was evidence of each of the factors described in *Anderson* as supporting a finding of premeditation and deliberation.

Furthermore, the jury reasonably inferred that Perez intended murder, and not just torture. Perhaps none of the injuries inflicted on Kunstmann was likely fatal on its own, but expert testimony supported the conclusion that "accumulation of the attacks on the body" did in fact kill her. Analogously, at some point, a series of violent acts, taken as a whole, is reasonably viewed as circumstantial evidence of intent to kill, even if none of those acts was likely to have been fatal on its own. Although other inferences could arguably be made, here we must view the evidence with due deference to the jury's determination. In our view, the jury's finding that Perez acted with premeditated and deliberate intent to kill was eminently reasonable.

There is also substantial evidence in support of the jury's determination regarding James's culpability. Among other things, her child was one of those that Kunstmann purportedly had endangered and threatened to kill. According to James's statements to police, the decision to "get the truth out of [Kunstmann] one way or another" was at least partially hers. James had participated in violence against Kunstmann on at least one previous occasion—the group beating that preceded the torture—and there was evidence that, despite her denials, she actively participated in at least some portions of the torture that eventually killed Kunstmann, and she was present with Perez and Kunstmann during other portions. Thus, there was evidence of each of the *Anderson* factors—planning, motive, and manner of killing—with respect to James as well as Perez. The jury's determination that she, too, intended to kill Kunstmann was supported by substantial evidence, even if other inferences were also possible.

13

Additionally, the jury properly could find that James and Perez acted with premediated and deliberate intent to kill even if it credited their claims that, after torturing Kunstmann, they attempted to nurse her back to health. (See *People v. Lashley* (1991) 1 Cal.App.4th 938, 945 [that defendant "abandoned his efforts" to kill the victim "does not compel the conclusion that he lacked the animus to kill in the first instance"].) And, of course, the jury was "free to reject, as it necessarily did," the defendants' "self-serving testimony" that they intended only to inflict "nonfatal" injuries or merely scare Kunstmann. (*Id.* at p. 946.)

Viewed in the required, deferential light, the evidence was sufficient to support the jury's determination that both Perez and James were guilty of premeditated and deliberate murder.

B. *Perez's Motions for Mistrial*

Perez contends the trial court erred by denying his trial counsel's several requests for a mistrial based on ineffective assistance of counsel for failing to adequately investigate potential defenses "relevant to whether [Perez] actually had the required mental states" due to his psychological condition. We reject this contention.

1. *Additional Background*

At trial, several witnesses testified that Perez would often engage in unusual behavior and make bizarre, false statements. For example, sometimes he would claim (falsely) that he had served as a Navy SEAL or that he was a registered nurse. When he would lose his temper at Kunstmann, he would sometimes fake having a seizure. On

14

other occasions, Perez would pretend to be not himself, but rather his own, nonexistent twin brother Jessie. The witnesses simply did not believe Perez's claims, concluding he was a liar. Kunstmann, however, was more gullible, believing, for example, that Perez really had a twin brother.[4]

After hearing this testimony, Perez's counsel—who had substituted in relatively late, after Perez's previous public defender had declared a conflict—informed the court that he "did not know" that his client "has invisible and nonexistent people in his background, that he's telling all kinds of lies, stories about occupations that he never did experience." Counsel was concerned that the testimony showed Perez has a "substantial psychiatric background" that he (counsel) had been "unaware of." Counsel concluded that he and Perez's former counsel had been "remiss" by not investigating further, including by having Perez undergo a psychological examination. Counsel represented to the court that Perez's previous counsel had told him that she "didn't think" any psychological evaluation of Perez had been performed, and once the prosecution decided not to seek the death penalty, he had not followed up on the issue further. On that basis, counsel requested a mistrial based on his own ineffective assistance, and that of Perez's previous counsel. The trial court denied the motion, finding that although Perez "makes rather ludicrous statements," there was "no evidence . . . that it appears that he believes them to be true." Thus, the court found, there was no evidence of any "true psychiatric or

---

[4] In James's interview with police, admitted into evidence later in the trial, she stated that Kunstmann had a "fling" with "Jessie."

15

even psychological issue other than an attempt to manipulate someone who is weaker minded than he is."

Subsequently, another witness similarly testified that Perez had told her and Kunstmann that he had a twin brother, that he fabricates stories, and that he would take Kunstmann's seizure medication (Klonopin) for apparently fake seizures. Perez's counsel renewed his motion for a mistrial; the trial court did not change its earlier ruling.

Several days later, Perez's counsel informed the court that while speaking with Perez that morning, Perez had stated that "at the age of 9 he spent nine months in a hospital because of injuries to his head and to his rectum," and that the person who caused those injuries had been incarcerated. Perez had not told a defense investigator who interviewed him previously that he had suffered these injuries. Counsel also had just learned that Perez receives government aid for ongoing disabilities, specifically, "he's got blackouts, got special needs, if you will." Counsel again argued that he, as well as Perez's previous counsel, had provided ineffective assistance by failing to further investigate, stating: "There might be any number of tests from psychiatrists, from physicians, head examinations, any number of those that could have assisted me in evaluating what my next step was going to be." On that basis, counsel again contended that Perez had received ineffective assistance of counsel, and a mistrial should be declared. The trial court denied the motion.

After the close of evidence, Perez's counsel asked that the trial court instruct the jury regarding mental impairment using CALCRIM No. 3428. The court agreed to give

16

that instruction.[5]  Perez's counsel also renewed his motion for a mistrial, but the court again denied that motion.

    2.  *Applicable Law*

"The fundamental idea of a mistrial is that some *error* has occurred which is too serious to be corrected, and therefore the trial must be terminated, so that proceedings can begin again." (*Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672, 678.)  "[T]he trial judge, present on the scene, is obviously the best judge of whether any error was so *prejudicial to one of the parties* as to warrant scrapping proceedings up to that point. (*Ibid*.)  "'A trial court should *grant* a mistrial *only* when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling *denying* a mistrial.'" (*Id.* at p. 679.)  "A merely debatable ruling cannot be deemed an abuse of discretion." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

To show ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's actions fell below professional norms *and* that it is reasonably probable that a better result would have been obtained had counsel acted according to professional norms.  (See *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.)  The failure to make

---

[5]  The instruction, as given, reads as follows:  "You have heard evidence that the defendant Perez may have suffered from a mental disorder which may have caused seizures.  You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime and allegation.  [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state.  If the People have not met this burden, you must find the defendant not guilty."

17

"reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" can be the basis for an ineffective assistance of counsel claim. (*Strickland v. Washington* (1984) 466 U.S. 668, 691; see *People v. Ledesma*, *supra*, 43 Cal.3d at p. 215 [a defendant can "reasonably expect that before counsel undertakes to act at all [counsel] will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation"].)

3. *Analysis*

We are not persuaded that the trial court abused its discretion in denying Perez's repeated requests for a mistrial. Although Perez's trial counsel represented that previous counsel had told him that she "didn't think" any psychological evaluation of Perez had been performed, there is ultimately no evidence establishing the actual scope of the defense's investigation into possible defenses. There is no evidence supporting the report that Perez may have been abused and suffered a head injury as a child—not even a declaration or other sworn testimony from Perez himself, let alone any corroborating evidence that such an injury continues to have ongoing effects that might be relevant to this case. There is no evidence, only speculation, linking together the chain of several inferences required to get from (1) testimony regarding bizarre falsehoods that Perez apparently used to manipulate Kunstmann among others, to (2) Perez suffers from delusions, and he actually believes those falsehoods, to (3) Perez suffers from a mental impairment of such a nature and severity that it tends to show that he did not have the requisite criminal intent for one or more of the charged offenses. Perez therefore has not

18

demonstrated either that his counsels' actions fell below professional norms, or that there is a reasonable probability the results of trial would have been different if counsel had arranged to have Perez psychologically evaluated as part of its investigation of possible defenses.

On this record, there is no appropriate basis for us to disturb the trial court's determination that a mistrial was not warranted.

C. *Jury Instruction on Aiding and Abetting*

James contends that the jury's instruction on aiding and abetting was prejudicially ambiguous in that it "did not adequately distinguish between aiding and abetting liability for torture and aiding and abetting liability for murder." We find this argument without merit.[6]

---

[6] "Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Andrews* (1989) 49 Cal.3d 200, 218.) James did not make any such request in the trial court. There is an exception to this forfeiture rule, however, where the claimed instructional error "affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) Determining whether this exception applies "necessarily requires an examination of the merits of the claim." (*Ibid.*) Moreover, we have the discretion to address James's claim of instructional error on its merits to "forestall a petition for writ of habeas corpus based on a claim of ineffectual counsel." (*People v. Williams* (2000) 78 Cal.App.4th 1118, 1126.) We find it most expedient, therefore, to focus our discussion here on the merits.

1. *Additional Background*

Without objection from any party, the trial court instructed the jury on aiding and abetting using CALCRIM No. 401.[7] Other standard instructions informed the jury that it was the People's burden to prove not only that each defendant did the charged acts, but that the defendant acted with a particular "intent and or mental state." The jury was directed to still other instructions, also standard instructions, for explanation of the

---

[7] The aiding and abetting instruction, as given, was as follows:
"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
    1. The perpetrator committed the crime;
    2. The defendant knew that the perpetrator intended to commit the crime;
    3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;
    AND
    4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
    Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.
    If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.
    [If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.]
    [A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things:
    1. He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating. The notification must be made early enough to prevent the commission of the crime.
    AND
    2. He or she must do everything reasonably within his or her power to prevent the crime from being committed. He or she does not have to actually prevent the crime.
    The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory.]"

20

"specific intent and/or mental state" required for each of the crimes or allegations at issue.

2. *Applicable Law*

We review a claim of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) An instruction can be found to be ambiguous or misleading only if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words. (*People v. Frye* (1998) 18 Cal.4th 894, 957, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421 fn. 22.) We assume that jurors are intelligent and capable of understanding and correlating all the jury instructions. (*People v. O'Malley* (2016) 62 Cal.4th 944, 991.) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

3. *Analysis*

James argues that the instruction on aiding and abetting improperly allowed the jury to convict her of murder based solely on a finding that she aided and abetted torture, even if she withdrew from the torture before the violence against Kunstmann escalated to a fatal degree, and even if she never harbored any intent to kill Kunstmann and did not know that Perez did. We are not persuaded. Particularly when the instructions are considered as a whole, it is not reasonably likely the jury misunderstood them in the manner James suggests.

CALCRIM No. 401 unambiguously requires the jury to analyze the defendant's and the perpetrator's intents separately for each crime. To find a person "guilty of *a crime* based on aiding and abetting *that crime*," the jury must find that the "perpetrator committed *the crime*," the defendant "knew that the perpetrator intended to commit *the crime*," that the defendant intended to aid and abet the perpetrator "in committing *the crime*, and that the defendant's words or conduct in fact did aid and abet the perpetrator "in committing *the crime*." (Italics added.) This language is not open to being construed to allow a defendant to be found guilty of one crime based solely on committing or aiding and abetting a different crime.

James focuses on CALCRIM No. 401's reference to the perpetrator's "unlawful purpose," a term that when taken in isolation could have several meanings. In context, however, there is no ambiguity: "Someone aids and abets *a crime* if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime*." (Italics added.) In context, "unlawful purpose" unambiguously refers to the perpetrator's intent to commit the particular crime that the defendant allegedly aided and abetted. Put another way, using the language of the instruction: CALCRIM No. 401 allows the jury to find James aided and abetted *murder* only if she knew Perez harbored the unlawful purpose of committing "that crime," and James "specifically intend[ed]" to aid and abet him doing so. The instruction is *not* reasonably read to suggest that James

22

could be liable for aiding and abetting murder despite knowing only that Perez intended some other, lesser "unlawful purpose" such as torture.

James's comparison of this case to *People v. Butts* (1965) 236 Cal.App.2d 817 (*Butts*) is unpersuasive. In *Butts*, the issue was not any purported ambiguity in the aiding and abetting instruction, but rather a lack of any evidence in support of the aiding and abetting allegation. (*Id.* at pp. 836-837.) The defendant Butts knew he was participating in a fist fight with his codefendant against the victim, but there was no evidence he knew the codefendant had a knife, let alone that he knew of and intended to aid and abet the codefendant's intent to use the knife to stab the victim. (*Id.* at p. 837.) On that basis, the Court of Appeal found the evidence insufficient to support a finding that Butts aided and abetted a homicide. (*Ibid.*) In contrast, the evidence here, as discussed above, was sufficient to support a finding that James was guilty of first degree murder—whether as a direct perpetrator or as an aider and abettor—even though other inferences were also possible.

We also are not persuaded by James's argument that certain comments by the prosecution "conflated 'knowledge' of Perez's intent to murder with his intent to torture," and support her claim of instructional error. We doubt, for one, that the prosecution comments at issue are most reasonably understood as James proposes.[8] Also, James's

---

[8] During closing argument, the prosecutor asked the jury to focus on the aiding and abetting instruction, commenting as follows: "The other instruction I'm going to ask you to look at is aid[ing] and abetting. And this applies to murder as well [as] torture. And here if they know—Aider and abettor is the person helping out. If they know what is going on and what the main person is doing and they are aiding it, they are on the

23

own counsel countered any such understanding of the instructions, discussing the elements of aiding and abetting at length, and arguing James could not be held liable for aiding and abetting Perez in murdering Kunstmann because, among other reasons, she did not know he intended to commit murder, let alone intend to help him do so. More fundamentally, the jury was instructed that it was required to follow the law as explained in the instructions, and if attorney comments on the law conflicted with the instructions, it was to follow the instructions. There is no basis in the record to conclude that the jurors were unable or willing to do so.

In short, James has not demonstrated that CALCRIM No. 401 is an inaccurate statement of the law or that it is ambiguous in any relevant respect. We find no reasonable likelihood the jury misunderstood it in the manner James suggests. We therefore reject her claim of instructional error.

D. *James's Ineffective Assistance Claim Regarding the Torture Special Circumstance*

James argues that certain comments by the prosecutor during rebuttal closing argument misstated the elements of the torture murder special circumstance. She contends that this prosecutorial error was compounded by language in the jury's verdict form that amplified the mischaracterization of the elements of the special circumstance

---

hook. It is like the robbery example I gave you during voir dire. You give someone a ride to the bank, they rob the bank, get back in your car, you drive them away and split the money, you aided and abetted it. This is the same thing. The argument can be made that there was aiding and abetting going on during the torture and during the murder.[¶] And it tells you right here that you can consider the mere fact that the person was present for three days while [Kunstmann] was suffering in that bathtub and being tortured is what aiding and abetting goes to."

allegation. Because James did not object at trial to either the prosecutor's comments or the verdict form, her arguments are framed as an ineffective assistance of counsel claim. That claim fails because the prosecutor's comments and the verdict form language at issue are not reasonably understood as statements of the *elements* of the special circumstance. Rather, they refer to the *existence* of the special circumstance allegation, the elements of which were described correctly in the jury's instructions.

The trial court instructed the jury using CALCRIM No. 733, which describes the four elements of the torture murder special circumstance allegation as follows: (1) "The defendant intended to kill [Kunstmann]"; (2) "The defendant also intended to inflict extreme physical pain and suffering on [Kunstmann] while that person was still alive"; (3) "The defendant intended to inflict such pain and suffering on [Kunstmann] for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason"; and (4) "The defendant did an act involving the infliction of extreme physical pain and suffering on Kunstmann."

During rebuttal closing argument, the prosecutor commented as follows: "The special finding that we'll ask you to find a true or not true allegation on each one of them is that they personally inflicted torture on [Kunstmann]. It's clear on the tape. She says, Yeah, I burned her three times, I held her down. That is personal infliction of torture and that's why I am asking for that finding." The prosecutor ended her rebuttal closing with the following: "There is no other confusion in this case than to find them both guilty of

25

first degree murder with a special circumstance that they personally inflicted the acts of torture on [Kunstmann]."

The verdict form the jury used to return a true finding on the special circumstance allegation as to James reads as follows: "We, the jury in the above-entitled action, find the allegation that in the commission of the offense charged in Count 1, the following special circumstance applies: The defendant, DESERAE LENORE JAMES, personally inflicted TORTURE pursuant to Penal Code section 190.2(a)(18) as defined in CALCRIM instruction 733."

James focuses on the phrase "personally inflicted torture," which was used by the prosecutor and appears in the verdict form. She reads it as an incorrect statement of the elements of the special circumstance, contending it "substitute[s] an act (actus reus) [whether she personally inflicted torture] for her intent (mens rea), which greatly lessened the government's burden of proof."

To put it mildly, this is not the most natural reading of either the prosecution's comments or the verdict form. Rather, the prosecutor used the phrase as a shorthand description to refer to the special circumstance allegation while asking the jury to return a true finding on it. The verdict form similarly uses the phrase "personally inflicted torture" as a description of the allegation, but expressly refers the jury to the definition in CALCRIM No. 733 for its elements.

As our Supreme Court, in an opinion cited by James, has stated: "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the

26

whole argument and the instructions' [citation], there was a 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) Similarly, the verdict form must be "'"'construed in light of the issues submitted to the jury and the instructions of the court."'"" (*People v. Jones* (1997) 58 Cal.App.4th 693, 710.)

Particularly when viewed in context, we find the prosecutor's comments and the verdict form are not reasonably construed in the manner James proposes, and find no reasonable likelihood that the jury misconstrued them in that manner. Her trial counsel, therefore, had no duty to raise any objection. (See *People v. Price* (1991) 1 Cal.4th 324, 387 [defense counsel does not render ineffective assistance by declining to raise meritless objections].) We reject James's claim of ineffective assistance of counsel on that basis.

E. *James's Ineffective Assistance Claim Regarding Intent to Kill*

James argues that certain comments by the prosecutor during closing arguments improperly conflated implied malice with intent to kill. Again, because James did not raise any objection to these remarks at trial, her argument is framed as an ineffective assistance of counsel claim. Again, we are not persuaded.

Without objection, the trial court instructed the jury on the elements of murder, including the difference between express and implied malice, using CALCRIM No. 520.

27

It used CALCRIM No. 521 to instruct on the difference between first degree and second degree murder. It is not disputed that these instructions correctly describe the law.

At several points during the prosecution's closing argument, and again in rebuttal to the defense's closing, the prosecutor emphasized that the evidence showed that James had failed to seek help for Kunstmann even though she had opportunity to do so. James reads the prosecutor's remarks to "equate[] knowledge that one's conduct endangers the life of another and acts with a conscious disregard for human life (implied malice) with specific, deliberate, and express intent to kill."

We disagree with James's interpretation of the prosecutor's remarks. Viewed in context, the prosecutor did not suggest that it would be proper to find James guilty of first degree murder based solely on actions demonstrating only implied malice, rather than intent to kill. Rather, the prosecutor argued that the defendants' failure to seek help for Kunstmann over a period of days as she lay dying in the bathtub was circumstantial evidence of their intent to kill, and that the killing was willful, deliberate, and premeditated.[9] The prosecutor also responded to James's testimony and her counsel's

---

[9] In its closing, the prosecutor argued: "Now, to take it to first degree murder, there's a little bit more required. It's called deliberation and premeditation. They have to willfully deliberate and with premeditation commit the murder. How do you know that? Well, look at how long it took for her to die. And all the things they did, they did willingly, deliberately, and they had time to think these things through.[¶] And how do we know? Well, they never called for help. They never stopped it. All those things go to premeditation, deliberation. You have to look at all those things they did over those three days, the beat down, the bathtub, all of those things. That tells you it is premeditated and it's deliberate. That's for Count 1 for first degree murder."

Later in the prosecution's closing, the same points were repeated: "They acted together. They intended to murder [Kunstmann]. It was premeditated. It was willful and

28

argument that she had wanted to help Kunstmann, but had been unable to do more than she did.[10]  Both of these arguments were reasonable and appropriate.

Our Supreme Court's opinion in *People v. Gray* (2005) 37 Cal.4th 168 (*Gray*) is instructive.  In that case, the defendant killed an 87-year-old woman, who died of asphyxiation when the defendant tied her up, gagged her, and raped her.  (*Id.* at pp. 178-181.)  During closing argument, the prosecution argued that intent to kill could be inferred from evidence that the defendant, "after binding and gagging the victim, saw she

---

it was deliberate.  If they wanted another outcome, they would have gotten help. Somebody could have ran out of that apartment, run to a neighbor, run to the police station, and nobody did because they didn't want to get caught.  This was the perfect murder.  They controlled the environment.  They controlled who came and went.  And they controlled the evidence.  They controlled destroying the evidence.  They controlled where her body would be. [¶]  They did all of this together.  This was not a one-man show.  And that is why they are both guilty of murder in the first degree with a true finding that it was torture and also the second count of torture itself.  All of the evidence points to that."

[10]  During the prosecution's rebuttal closing, the prosecutor responded to the defense's "excuse[s]" for why James could not have done more to help Kunstmann: "Opportunities to get help.  She had many.  She had her own apartment.  She could have left when [Duncan] walked in.  She could have walked out the door.  It was unlocked. She says, when you listen to her interview with Perez, when they are interviewed together, they discuss how she kept walking in and out of the bathroom while Perez and Backlund were still in the bathroom."  After listing a number of other things that James "could have" done, the prosecutor concluded:  "But she didn't.  She had many opportunities."

The prosecution also pushed back on the defense's suggestion that the evidence showed James tried to nurse Kunstmann back to health, or that evidence of what efforts she did make should be viewed to undermine the inference of intent to kill:  "They made no efforts to save her life and that is why it is specific intent to kill and that is why it's first degree murder. [¶]  There are so many things they could have done, but they didn't for three days.  They went to bed for hours while [Kunstmann] was dying in a bathtub, hours.  And then they would get up and check on her.  Those are people that want someone to die.  They weren't sitting by the bathtub helping her the whole time.  It was whenever they felt like it. . . . Their refusal to get her help shows their intent to kill."

29

was in severe distress but did not come to her aid and simply watched her die." (*Id.* at p. 217.) "These actions, the prosecutor argued to the jury, constituted intent to kill." (*Ibid.*) The Supreme Court found no prosecutorial misconduct, rejecting the defendant's contention that the prosecutor had "incorrectly equated intent to kill with implied malice." (*Id.* at pp. 217-218.) The Supreme Court interpreted the prosecutor's comments as an appropriate argument that "the victim's death was not incidental or accidental but the predictable outcome of defendant's course of conduct. Because it was likely the victim would suffocate, argued the prosecutor, the jury should infer that when defendant bound, gagged, beat, raped, and sodomized her, he acted with the intent that she should die." (*Id.* at p. 218.) Here, similarly, the prosecution reasonably argued that the jury should infer from the circumstances of Kunstmann's death and Perez and James's behavior as she lay dying that they both intended to kill Kunstmann.

James argues that this case is distinguishable from *Gray* on its facts, emphasizing evidence that James "did not join in Perez's final acts of torture," that she "naively believed [Kunstmann] would survive the torture," and that she "cared for [Kunstmann] before she died," and concluding that in this case, "death was not the predictable outcome of her course of conduct." This view of the evidence, however, is disputable, to say the least, and the prosecution appropriately argued for a different interpretation.

Additionally, we again note that, even if the prosecutor's remarks are susceptible to the interpretation that James proposes, we """"do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's

30

statements.'" (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.) When the prosecutor's comments regarding intent to kill are considered in context, and in light of the unambiguous jury instructions explaining the concepts of express and implied malice, we find no reasonable likelihood the jury was misled in the manner James proposes. She therefore has failed to demonstrate that her trial counsel was ineffective for failing to object to those comments.

F. *Cumulative Error Doctrine*

James argues that the cumulative error doctrine applies to require reversal of her murder conviction, even if the individual errors she identifies, taken separately, do not. We have found no merit in James's claims of error, however, so there is no error to cumulate.

G. *Section 654*

Defendants contend that their punishments for count 2 must be stayed pursuant to section 654. The People concede, and we agree, that defendants are correct.

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) It is undisputed that the same course of conduct underlying count 2 was also the basis for the torture-murder special circumstance of count 1. Section 654 therefore applies, and requires the lesser of the two punishments—the life sentence imposed for count 2—to be stayed. We will modify the judgment accordingly.

H. *Parole Revocation Fine*

The trial court imposed and stayed parole revocation fines pursuant to section 1202.45 with respect to both defendants. As the People concede, because both defendants were sentenced to life without the possibility of parole, no such fine should have been imposed. (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 ["When there is no parole eligibility, the [parole revocation] fine is clearly not applicable."].) We therefore will modify the judgments by striking the stayed parole revocation fines.

I. *Perez's Abstract of Judgment*

Perez observes that his abstract of judgment states incorrectly that his sentence for count 2 was life imprisonment without the possibility of parole, instead of simply life imprisonment. Additionally, his abstract of judgment states that he is entitled to presentence credits for 480 days of actual time served. In fact, he is entitled to credit for 1,480 days of actual time served. The People concede, and we agree, that these errors must be corrected.

## III. DISPOSITION

Perez's abstract of judgment must be corrected to reflect that the sentence imposed on him for count 2 was life in prison, not life without the possibility of parole, and that he is entitled to 1,480 days, not 480 days, of presentence credits for actual time served. The judgments against Perez and James are both modified in the following respects: (1) the life sentence imposed on count 2 is stayed pursuant to section 654; and (2) the stayed

parole revocation fine is stricken. The trial court is directed to prepare and forward to the

appropriate agencies amended abstracts of judgment reflecting these corrections and

modifications. As modified, the judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL
_____
J.

We concur:

RAMIREZ
_____
P. J.

MENETREZ
_____
J.

33